# EXHIBIT B

1

```
                 UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEW JERSEY
                         CHAPTER 7
                  CASE NO. 16-12781 (MBK)


                                        ORIGINAL


      - - - - - - - - - - - -


   IN RE:

   JOSEPH S. RACCUIA,

            Debtor.


      - - - - - - - - - - - -



            DEPOSITION OF JOSEPH S. RACCUIA

   taken by and before JOSEPH NATALE, a Certified

   Shorthand Reporter and Notary Public of the

   State of New Jersey, at the law offices of FOX

   ROTHSCHILD LLP, 75 Eisenhower Parkway, Roseland,

   New Jersey, on Tuesday, September 13, 2016,

   commencing at 11:09 in the forenoon..
```

                J&M REPORTING SERVICE
              28 Bloomfield Avenue, Suite 204
                 Pine Brook, New Jersey 07058
          (PH) 973-618-9087      (FAX) 973-618-0808

Joseph S. Raccuia

11

1          Q.      How long have you been practicing

2     under Joseph S. Raccuia MD PC?

3          A.      About six months, maybe.

4          Q.      When did H & T stop operating?

5          A.      From my recollection, you know,

6     when I, when I was out of work.

7                  And that was October, 2014, maybe.

8     And I can't recall, there might have been some

9     action, some, you know, with collectibles, but

10    that's basically more or less when it stopped,

11    as far as I can remember.

12         Q.      So approximately a year and a --

13         A.      Yeah.

14         Q.      Half --

15         A.      Yeah.

16         Q.      Gap --

17         A.      Yeah.

18                 And like I said, I'm not sure if

19    there was any work done on that but, but, yes,

20    more or less.

21         Q.      When you say "on that" --

22         A.      On H & T.

23                 I'm sorry.

24         Q.      Were you practicing in-between H &

25    T and Joseph S. Raccuia MD?

Joseph S. Raccuia

13

1      A.      During the course of her school

2   year, yes.

3      Q.      Do you recall how much in tuition

4   payments?

5      A.      I think it was about sixty, sixty

6   thousand a year, something like that.

7              Fifty.  Fifty something.

8      Q.      I'll get to the big question.

9              What was the cause of your

10   bankruptcy filing?

11      A.      A number of issues.

12              The biggest one, quite frankly,

13   which I have to take full, you know,

14   embarrassing responsibility for, I had tax

15   issues.

16              The woman I was married to, we

17   were separated for five, six years before we got

18   divorced, and we initiated a divorce, and the

19   lawyers ate up a ton of money, so, we just said,

20   you know what, let's, let's just, you know,

21   leave it alone.  So she went her way, I went my

22   way.

23              During that time, and, you know,

24   the history that we had, she was a spender, huge

25   spender.  And instead of me paying taxes, I used

14

Joseph S. Raccuia

1    to pay for her bills, so I ended up with a huge,

2    huge tax liability.

3              And that was part of it.

4              The other thing is that, you know,

5    why I got divorced, you're asking personally,

6    emotionally?

7         Q.    I'm asking why you filed for

8    bankruptcy?

9         A.    Oh, because, it really initiated

10   with the huge tax burden I had.

11             So then I thought I was able to,

12   with my income, sustain the costs of the taxes,

13   the divorce, and then what happened, was, in

14   October, 2014, I had been at NYU for five years,

15   I was at St. Vincent's for twenty years before

16   that in Manhattan, Greenwich Village, and they

17   went bankrupt.

18             I went to NYU and I had a huge

19   falling out with the department.  They wanted me

20   to become a faculty doctor and I said okay, and

21   then when they presented their plan to me it

22   was, it was not a good plan, and I said no, and

23   then they made my life miserable.

24             I don't know if you -- if you

25   understand or, or I can let you understand.

Joseph S. Raccuia

26

1        Q.      Have you owned any other property

2    in the last ten years?

3        A.      No.

4        Q.      Have you ever owned property at

5    342 West 15th Street?

6        A.      No.

7        Q.      No.

8                Have you ever owned property at

9    70A Greenwich Ave, Suite 101, New York?

10       A.      No.

11       Q.      Or rent property at that address?

12       A.      It's a drop box.

13       Q.      A drop box?

14       A.      Um-hum.

15       Q.      For business?

16       A.      Yes.

17       Q.      What about the 342 West 15th --

18       A.      A rental apartment.

19       Q.      Did you reside there?

20       A.      I had lived there for about a

21   year.

22       Q.      When?

23       A.      Up until, I think, April, 2015.

24       Q.      So you lived there after you lived

25   at 113 Bedford?

Joseph S. Raccuia

27

1       A.      I lived in a few places.  I lived

2   in -- somebody gave me an apartment to live in

3   for two years, one of my patients, when I

4   separated, in the Village, on James Street.

5               And then I moved to Soho for about

6   three years, and then I got -- I moved to 15th

7   Street after that.

8       Q.      Do you own any vacation homes or

9   time-shares in the last ten years?

10      A.      No.

11      Q.      Did you purchase any properties

12  for your daughters in the last ten years?

13      A.      No.

14      Q.      Do you receive any rental income

15  from 113 Bedford Street?

16      A.      No.

17      Q.      Have you ever received rental

18  income in the last ten years from any property?

19      A.      No.

20      Q.      Go back to T-2, which is your

21  bankruptcy petition.  Your attorney could help

22  you.

23              I'm going to go to what's called

24  Schedule B.

25

Joseph S. Raccuia

33

1

2          (Whereupon T-4 is received and

3      marked for identification.)

4

5      Q.      Do you recognize what's been

6   marked as T-4?

7      A.      Yes, it's funny, I don't -- I

8   vaguely remember this, but I, quite frankly, I

9   don't even know -- remember what it's about.

10     Q.      Well it's called a "Joseph S.

11   Raccuia Irrevocable Trust".

12          Do you recall creating an

13   irrevocable trust?

14     A.      Vaguely.

15          And it was tied into a Will that

16   was never created.

17     Q.      A Will for who?

18     A.      For, for me.

19          For me to make a Will back then.

20     Q.      Do you recall what the purpose of

21   the trust was?

22     A.      Not really.

23     Q.      Do you recall if you transferred

24   any assets into the trust?

25     A.      I do not.

34

Joseph S. Raccuia

1      Q.      It lists Angelo Natoli as the

2   trustee.

3              Does that ring a bell for you?

4      A.      Yes, he's my accountant.

5      Q.      Did you have any conversations

6   with him about this trust, in the last couple

7   years?

8      A.      No.

9              I mean this is like -- I didn't

10  even remember this.

11     Q.      So you don't recall giving or

12  transferring any assets into it?

13     A.      No.

14     Q.      Do recall taking any assets out of

15  the trust?

16     A.      No.

17     Q.      Have you created any other trusts

18  at any point in time?

19     A.      No.

20     Q.      Do you currently have any life

21  insurance policies?

22     A.      I do.

23     Q.      Whole or term?

24     A.      Term.

25     Q.      Is there a cashout value?

Joseph S. Raccuia

40

1       A.      Not really.

2              I mean everything, everything that

3       she had was already really her's.

4       Q.      So other than real estate, is

5       there any property or assets of note that were

6       given to your ex-wife or that she was able to

7       claim as a result of the divorce?

8       A.      No.

9       Q.      Turning back to your petition,

10      that's T-2, I believe.

11             You have the offices of H & T

12      listed on page 16.

13      A.      Okay.

14      Q.      It says your percentage of

15      ownership is a hundred percent.

16             But just to be clear, you said,

17      earlier, if I'm correct, it's not operating?

18      A.      Correct.

19      Q.      And when was the last time it

20      operated?

21      A.      I, I believe in 2014, when I left

22      NYU.

23      Q.      Where was it located?

24      A.      In New York City.

25      Q.      What was its office address?

42

Joseph S. Raccuia

1    Q.    Who kept the books and records for

2    the business?

3    A.    My accountant, Angelo Natoli.

4    Q.    Did you use any kind of QuickBooks

5    or Peach Tree or other accounting software to

6    keep track, yourself, of the business?

7    A.    No.

8    Q.    Did the business have any income

9    in 2015?

10    A.    I don't know the answer to that,

11    actually.

12    Q.    Did you ever make any loans to the

13    business?

14    A.    I might have over the years, if I

15    had low -- if I had low receivables and I needed

16    to pay bills I might have, maybe a couple of

17    times, but I don't recall, distinctly.

18    Q.    Did you ever transfer any assets

19    to the business?

20    A.    No.

21    Q.    And you said you currently have a

22    practice under your own name, Joseph S. Raccuia,

23    MD, correct?

24    A.    Correct.

25    Q.    And that was started, you said,

Joseph S. Raccuia

48

1    are exclusive to Joseph S. Raccuia MD?

2         A.      If that's -- if this is an

3    accounting thing from my accountant, yes.

4         Q.      Do you use a billing company to

5    bill out your receivables?

6         A.      Yes.

7         Q.      What's the name of the billing

8    company?

9         A.      It's MedPro Systems.

10        Q.      How long have you been using them?

11        A.      Probably since 2 -- I'm going to

12   say, '11, '12.

13        Q.      So you were using them with H & T,

14   previously?

15        A.      Yes.

16               Well, well up until, you know, H &

17   T is older than that, but, yes, they came on

18   board and H & T was still in effect.

19        Q.      Do you have any separate company

20   that's collecting receivables or are they paid

21   directly to your office?

22        A.      No, they pay to me.

23        Q.      Are receivables still being

24   collected from H & T?

25        A.      You know, I don't think so.

Joseph S. Raccuia                                    49

1          I don't know the answer to that.

2          Q.      Do you know how much is

3  outstanding in receivables for H & T?

4          A.      You know, I hope to get that

5  information before we leave today.

6          Q.      Would MedPro have information for

7  what's outstanding for --

8          A.      That's who's working on it.

9          Q.      Do you have contact information

10 from MedPro?

11         A.      Yes.

12                 The number is 646-559-8594.

13         Q.      Do you recall the last time you

14 received any payments on account of receivables

15 due to H & T?

16         A.      I don't recall directly, no.

17         Q.      Do you believe the receivables

18 from H & T are still collectible?

19         A.      I think some of them are still

20 collectible, I think there are older ones that

21 are -- that would be a tough, a tough sell, but

22 it depends on who was dealing with that, that,

23 you know, that money.

24                 There are some people out there

25 that I think would buy them at a cut rate, but

Joseph S. Raccuia                                    50

1    the older they get, the less attractive they are

2    to, to these, these people, you know, I forgot

3    what they call them.

4            Q.      Somebody who wants to buy them --

5            A.      No, but there are companies that

6    do this.

7                    There are companies that actually

8    do this, you know, for a living.

9            Q.      Is MedPro still actively still

10   trying to collect H & T receivables?

11           A.      I don't know, because I don't know

12   what's actually still viable because you have to

13   remember, when you're dealing with a billing

14   company, they're, they're looking at stuff

15   that's -- they're happy -- they'll deal with six

16   months, after six months, the stuff might not be

17   viable and I don't know how active they are.

18                   And then other -- there are other

19   people that, that take interest in those, but

20   usually then it becomes a collection issue and

21   billing companies don't want to get involved in

22   that.

23           Q.      And you're going to provide us

24   with some documentation with respect to the H &

25   T receivables, correct?

Joseph S. Raccuia                              83

1    don't understand.

2                You're talking about in February?

3         Q.      Your petition was filed on

4    February 17, 2016 and according to the schedule

5    here your monthly income at that time was

6    eighty-three thousand nine hundred dollars.

7         A.      Again, if it says that, that's

8    probably when I started collecting money then,

9    again.

10        Q.      Was your income, at that point,

11   strictly from your practice, Joseph S. Raccuia,

12   MD?

13        A.      Well I had no income, really,

14   except that.

15        Q.      So your only source of income when

16   you filed for bankruptcy was from your practice?

17        A.      Yes.

18        Q.      Did you have any income from H & T

19   when you filed for bankruptcy?

20        A.      I don't recall.

21               Because, remember, that was

22   dwindling down and the reason that I had these

23   horrible -- this horrible period of time,

24   really, it got cut off right away because

25   those -- remember, those claims that we put out,

97

Joseph S. Raccuia

1    Q.    And T-12, do you recognize T-12?

2    A.    2015, yes, I -- this is H & T?

3          Yes, I do.

4    Q.    H & T tax return --

5    A.    Yes.

6    Q.    2015?

7    A.    Yes.

8    Q.    The total income is listed as

9    sixty-five thousand eight-hundred six dollars.

10         What kind of income was that?

11   A.    It was probably whatever was

12   residual, after I stopped working.

13   Q.    Related to receivables?

14   A.    Probably yes.

15   Q.    Do you anticipate there will be

16   income for 2016?

17   A.    On H & T?

18         No.  I mean, no, I don't think so.

19         I mean sometimes there is dribs

20   and drabs of things, but I don't think so,

21   offhand, no.

22         MR. HERZ:  I might take a quick

23         break.

24

25         (Whereupon there is a short recess

Joseph S. Raccuia                                                    115

1          A.      Yes.

2          Q.      On October 28, 2015 --

3          A.      The same page or --

4          Q.      Next page.

5          A.      Got it.

6          Q.      There is a thirty thousand dollar

7   wire, again, with the due to H & T notation.

8                  Do you recall what that wire is

9   for?

10         A.      No.

11         Q.      Was H & T operating in October 28,

12  2015?

13         A.      It was still open.

14         Q.      But was the business operating?

15         A.      Remember, I stopped -- let's see.

16                 The exact date that I stopped

17  working was, was October, middle of October,

18  2015, so it wasn't closed the day after I

19  worked.

20         Q.      I thought earlier you testified

21  you didn't work, at all, in 2015?

22         A.      Oh, 2014?

23                 Oh maybe -- you're absolutely

24  right.

25                 I apologize.

Joseph S. Raccuia

116

1     Q.     Do you need to take a break?

2            MR. FISCHER:  What was the correct

3     answer, Doctor?

4            THE WITNESS:  It was 2014.

5     Q.     2014 is when you stopped working?

6     A.     Yes.

7     Q.     So this transfer now --

8     A.     So --

9     Q.     This wire is made October 28, 2015

10    for thirty thousand.

11           If H & T is no longer operating

12    why is a thirty thousand dollar wire being made

13    to it?

14    A.     Because it's maybe money, money

15    that the -- remember, the, the PC is still open

16    at this point.

17    Q.     The H & T PC?

18    A.     Yes.

19    Q.     So the company is still in

20    existence?

21    A.     Yes.

22    Q.     What's the thirty thousand dollars

23    used for?

24    A.     I don't know.

25           Maybe, maybe, again, remember, I

Joseph S. Raccuia

133

1       A.      Got it.

2       Q.      There is a deposit, due to the

3   offices of H & T notation, for twenty-seven

4   thousand eight-hundred fifty-five dollars.

5       A.      That one I know.

6               That one was a, the -- that

7   lawsuit against Dr. Hirsch.

8               The --

9       Q.      That's the settlement --

10      A.      Yes --

11      Q.      Funds  --

12      A.      Yes, after he took his, his, his

13  piece of it, the lawyer.

14      Q.      So you received the settlement

15  funds in December, 2015?

16      A.      Yes.

17      Q.      Do you recall what happened to the

18  settlement funds?

19      A.      Again, same thing that happened

20  with everything else, I used it to pay these big

21  expenses of mine, to keep myself afloat.

22      Q.      Did you receive the rest of the

23  forty thousand dollars in settlement funds at

24  some point?

25      A.      No, that, that was the forty

Joseph S. Raccuia                                    143

1          A.      Hold on.

2                  Can you start with the page,

3     please?

4          Q.      Start at page 64.

5          A.      Got it.

6                  Payments for?

7          Q.      There is various payments.

8                  You said before you didn't think

9     the account was being regularly used but it

10    seems to be regularly used on various expenses.

11                 There's entertainment expenses,

12    iTune expenses, automobile expenses --

13         A.      Well those are business expenses.

14         Q.      How are they business expenses?

15         A.      Well you have to talk to my

16    accountant how he does that.

17         Q.      Is there a reason that H & T would

18    need to pay iTunes --

19         A.      Well in the office I have a

20    television.

21         Q.      Well H & T is not operating in

22    January, 2016.

23         A.      Again I don't know.

24                 This is an accounting question.

25                 I'm sorry, I don't know the answer

Joseph S. Raccuia                               144

1    to that.

2              Q.      There is a lot of restaurants, I

3    think I see Jean Georges in here, Zafra

4    Kitchens, a number of other places.

5                      Cafe Mogador.

6                      Did you use this account for

7    personal expenses?

8              A.      Again, whatever they -- what

9    happens, is, as I told you before, sometimes,

10   you know, I have two cards, a personal and a

11   business, and a lot -- all the time, you know,

12   they're always calling me on the phone.  Don't

13   use that card for this, don't use that card for

14   that, and I get all, you know, mumbo jumbo'd.

15                     I do know they back it out,

16   afterwards, whatever is actually deductible and

17   whatever is not.  So that's, to me, an

18   accounting question.

19                     I can't answer you completely

20   because I don't know, from an accounting

21   standpoint, quite frankly, what is really

22   deductible and what is not.

23             Q.      Looking at these statements,

24   though, would you say that the account was

25   regularly being used to pay expenses in the

Joseph S. Raccuia                            145

1   months before you filed for bankruptcy?

2         A.      Expenses for --

3         Q.      Anything.

4         A.      Expenses for business, obviously.

5                 Again, it's an accounting

6   question.

7         Q.      Well --

8         A.      In fact, he puts here

9   "entertainment", "automobile".

10        Q.      And you don't know why these were

11  business expenses?

12        A.      That's an accounting question.

13                I wish, I wish I could answer you

14  that.

15                I don't know.  I don't know the

16  details of accounting to that level.

17        Q.      Would there be any reason to pay

18  business expenses for H & T in January --

19        A.      Well --

20        Q.      2016?

21        A.      Well as I said to you, I still --

22  H & T was not, was not defunct.

23                H & T still accrued expenses, you

24  know, and I keep bringing up the biggest one was

25  my malpractice, and that should reflect what